Daggers *v.* Van Dyck.

JOHN R. DAGGERS

*v.*

FRANCIS C. VAN DYCK.

1. Evidence, to be believed, must not only proceed from the mouth of a credible witness, but it must be credible in itself, such as the common experience and observation of mankind can approve as probable, under the circumstances.

2. Laches only constitute a complete defence when the complaining party has slept so long over his wrongs, that if relief be given to him, great and serious harm will be done to his adversary.

On final hearing on bill and answer and proofs taken in open court.

*Mr. Socrates Tuttle,* for complainant.

*Mr. Thomas N. McCarter,* for defendant.

VAN FLEET, V. C.

The decision of this case requires simply the determination of a question of fact. In July, 1871, the complainant purchased of the defendant a house and lot situate on the south side of Ward street, in the city of Paterson. At the time of the purchase, the lot was enclosed by a substantial fence. Its width, within the fences, was thirty-one feet and ten inches, in front, and twenty-nine feet and eleven inches in the rear. A brick walk ran along its easterly side, extending from a gate in the fence enclosing the front, to a privy standing on the rear. The defendant, at the time of the purchase, owned the lot adjacent, on the

Daggers *v.* Van Dyck.

east, and occupied the house erected thereon. He had erected both houses—that which he occupied and also the one sold to the complainant. He had also erected the fences enclosing the complainant's lot, and the privy on the rear, and put down the brick walk. His deed to the complainant does not convey the lot as enclosed, but excludes a strip, triangular in form, extending along nearly the whole of its easterly side. This strip, at its base, is about three feet wide, and gradually contracts as it approaches the front, until it ceases entirely. This strip is the subject of the suit. The complainant alleges that he purchased the lot as it stood enclosed, and that the exclusion of this strip from the land conveyed is such a violation of his rights, under the contract, as can only be adequately redressed by a decree of specific performance. The defendant, in opposition to the complainant's claim, says that the complainant did not purchase the lot as enclosed, but that he was distinctly informed, during the negotiation, that the fence on the easterly side of the lot did not stand or the line by which the lot would be conveyed, but that the lot would be conveyed by a line running parallel with Prince street, which would cut off a part of the privy, and require the fence to be changed.

The question to be decided is, What did the defendant agree to convey? The parties themselves are the only witnesses who have given any evidence respecting the terms of the contract, and their evidence stands in irreconcilable contradiction at almost every point. They are agreed thus far: that the complainant, at the outset of the negotiation, asked the defendant if the lot would be conveyed by the lines indicated by the fences, but at this point they separate on the terms of the contract, never to meet again. The complainant swears that the defendant, in answering his question, said that the fences correctly represented the boundaries of the lot, and further said, in the same connection, that after he had made up his mind what style of houses he would build, he found that two ordinary city lots were not sufficient, and he then purchased an additional half lot and divided it, so that the curtilage of each house contained one and a quarter

ordinary city lots; while the defendant swears that he gave the following answer to the complainant's question :

"I can remember distinctly telling him that the lines were the fences, except the one directly between my house and that one; that, I told him, was a temporary fence entirely—it was not a correct line; that the correct line would make the passage-way narrow at the extreme points of his house, leaving sufficient passage for a person to pass through, and it would also take a portion off the privy, about one-third of it; I took especial pains to tell him all these things, and he listened to them without making any remark, and I supposed he heeded them at the time."

The defendant further says that he told the complainant that the east line of the lot would run parallel with Prince street, and that one of the main points he brought out in the conversation was that he intended to retain two city lots as the curtilage of his house, fifty feet front and rear. These are the two stories. They stand in such positive contradiction at every point that it is impossible to reconcile them. It is clear that they cannot both be true, and it is equally certain that one or the other must be rejected. The burden is on the complainant. He must satisfy the court, by a preponderance of proof, that his version of the contract is the true·one, or he must fail.

The court may very properly, in a case of this kind, where the evidence on the main point in dispute stands in such decided conflict, resort to the circumstances which are inherent in the transaction brought in judgment, as well as to those which are collateral to it, in order to see whose evidence they corroborate and whose they impugn. They may so far strengthen one and impugn the force of the other as to leave no doubt which story is true. The court is not bound to accept everything as true a witness may say.

Evidence, to be believed, must not only proceed from the mouth of a credible witness, but it must be credible in itself—such as the common experience and observation of mankind can approve as probable under the circumstances. We have no test of the truth of human testimony, except its conformity to our knowledge, observation and experience. Whatever is repugnant to these belongs to the miraculous, and is outside of judicial cognizance.

Daggers *v.* Van Dyck.

Evidence is generally considered improbable when it imputes to the parties to a transaction, occurring in the ordinary course of business, conduct inconsistent with the principles by which men, similarly situated, are usually governed.

Applying these tests to the two contradictory stories, I think there will be little difficulty in deciding which should be believed. In some of its aspects, the defendant's story seems to me to be incredible. In the first place, he says it was always his purpose, from the time he purchased the two lots, to have the line between them to run just where it does now, and that he built the house, on the lot he sold to the complainant, to sell or rent, as opportunity might offer; yet, with such a purpose fully matured in his mind, when he came to build the privy for the use of the complainant's house, he built it partly on land he intended to retain. Not only did he do this, but he built a strong and substantial fence, having the appearance of being intended to mark permanently the line of separation between the two lots, so as to throw part of the lot he intended to retain with the lot he intended to offer for sale, and in addition, he built a brick walk, as a passage to the rear of the house he intended to sell, partly on the land which, he says, he always intended to keep. It will be observed, if he had succeeded in finding a purchaser immediately after the completion of the house, and had then insisted on locating the line where he has now located it, and a sale had been effected, the money he expended in constructing the privy and putting down the brick walk would have been utterly wasted. If his testimony is true, this anomalous state of affairs is presented: He meant one thing, and had full power to do it, yet did something entirely different—something he did not mean to do, and which it was plain, at the time he did it, would result in loss to him. The almost certain effect of constructing the necessary conveniences to the house he intended to sell, in such manner that though they appeared to belong to the house, yet that neither he nor his purchaser could derive any benefit from them, was to render his house unmarketable. I find it impossible to believe that, at the time these erections were made, a fixed pur-

pose existed in the mind of the defendant to locate the line where he now says he always intended to locate it.

But again: The circumstances attending the making of the bargain, as well as the bargain itself, as given by the defendant, are extremely improbable. The witnesses agree that the complainant opened the negotiation cautiously; he inquired whether the fences indicated the boundaries of the lot. The defendant says he replied to that question by stating that the fence on the easterly side of the lot was not on the line; that the true line would make the passage, at the extreme points of the house, narrow, and would take off about one-third of the privy. He also says that he took especial pains in making this announcement, and though the complainant heard everything, he said nothing. Can that be believed? The complainant was purchasing the house for a home for himself and his family, and if he had not been curious to know why the defendant, in building a house to sell, had not built the fence on the line where he intended to establish it, and had not put the privy, erected for that house, on the lot he intended to sell, his interests would not have permitted him to be indifferent to the question whether the house possessed the ordinary conveniences of a home or not. If his curiosity did not provoke him to speak, his interests would have opened his mouth. But can it be believed that a man cautious enough to inquire whether the fences represented the lines or not, would have stopped in his inquiries when informed that they did not? That such announcement should have stopped the negotiations, it is not difficult to believe, but that it should have stifled all further inquiry or remark seems almost incredible. The conduct attributed to the complainant, by the defendant's evidence, is exceptionally singular. He is cautious up to the point where danger appears, where greater necessity for caution arises, and then he suddenly becomes careless and heedless and dumb. This is unnatural and improbable, and contrary to common experience.

If the defendant's evidence is true, he sold, and the complainant purchased, without either of them knowing exactly where the east line of the lot would run, and without either making the least effort, before the deed was made, to ascertain or to locate

the line, in accordance with a mutual understanding. If they dealt mutually, understanding that the fence was on the line, their conduct was reasonable and natural. There was nothing further, then, to be done, for the line was already established; but if a new line was to be located, the matter was of so much importance to both, that, under ordinary circumstances, neither would have allowed the other to locate it except in his presence. The defendant admits that he located it without measurement, in the absence of the complainant and without consultation with him. It was located without the least regard to the effect it would have on the complainant's house. The defendant admits that he did not attempt to ascertain how his location of it would affect the cornice of the complainant's house. The proofs show that if his location stands, part of the cornice overhangs the defendant's land. I do not believe that the complainant purchased with the understanding that the line should be so located that the defendant should have the right, at any time thereafter, to compel him to remove part of the cornice of his house, or that the defendant ever openly proposed a contract which would involve such consequences to the purchaser.

But further: The defendant makes an admission which, I think, shows clearly that he knew he was conveying less land to the complainant than the complainant believed he was entitled to under the contract. The description of the land conveyed was furnished to the scrivener who drew the deed, by the defendant. He says he also furnished a diagram. When the deed was delivered and the purchase-money paid, the defendant took possession of the diagram. His object in doing so, he admits, was that he might have undoubted evidence, in case any dispute arose, that he had sold only part of the lot, and he says he carefully preserved the diagram to meet that question, if it ever came up. If his evidence is true, there was no reason to fear future controversy; he had sold only part of the lot, and that part of the contract he had made special effort to make plain and clear. Why, then, at the very moment when the contract had been carried out according to his understanding, should he commence to collect evidence to meet a future dispute? If his

Daggers v. Van Dyck.

story is true, no future dispute was possible. If he had doubts whether the complainant understood the contract as he did, that was the time to clear them up. If he then supposed there was any misunderstanding as to the quantity of land to be conveyed, good faith and fair dealing made it his duty to state plainly and distinctly that the deed he.was about to make did not convey the lot as enclosed. That course would not only have removed all fear of future controversy, but would have furnished him with evidence as to the quantity of land to be conveyed, which he might very properly have described as undoubted. That, I think, is the course he would have pursued, instead of collecting evidence, if he had been free from any design to take an unjust advantage of the complainant. But if, on the contrary, he had agreed to sell the lot as enclosed, and afterwards conceived the purpose of attempting to inveigle the complainant into the acceptance of a conveyance of less land than he was entitled to, then fears of future dispute would naturally start in his mind, and he would feel the necessity of collecting and preserving evidence. His preparation for difficulty leads to the conviction that he was conscious of having done something that would give rise to a dispute.

Again : The defendant says, when he told the complainant he would not sell the lot as enclosed, he also told him that he would consider himself bound, as long as he held title to the adjoining lot, to allow the fence, on the east, to stand where it then did. He furnished the scrivener with the description of the land to be conveyed, and all the other facts necessary for him to have in preparing the deed. Why did he not have this promise inserted in the deed ? It was one of the rights the complainant was entitled to have assured to him. Besides, if the defendant wanted evidence, that was the way to get it. A clause, inserted in the deed, plainly declaring that the fence did not stand on the line, but that the complainant would be permitted to occupy up to the fence so long as the defendant owned the adjoining lot, would have precluded all possibility of future dispute. The deed would then have shown distinctly on its face that the fence did not stand on the line, and it would, in addi-

tion, have furnished almost conclusive proof that the complainant understood he was purchasing only part of the lot. The defendant's conduct must be viewed in the light of the fact that he thought he was in a position where it was necessary to guard himself against the consequences of a dispute, in the future, as to what he had agreed to convey to the complainant.

The weight of the evidence, when all the sources of proof are considered, is, in my judgment, decidedly with the complainant, and I think it should be decreed that he is entitled to relief. The delay of the complainant in seeking redress constitutes no defence. It is only when the complainant has slept over his wrongs so long that if relief be given to him great and serious wrong will be done to the defendant, that laches constitute a complete defence. Here the parties are in almost exactly the same position now that they were at the time the wrong, for which redress is sought, was done, and relief may be given to the complainant without doing any harm whatever to the defendant.

The defendant will be decreed to convey to the complainant so much of the lot enclosed as the conveyance already made omits. The complainant is entitled to costs.